ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL X

| LUZ K. PIZARRO CORREA en representación de D.J.P.P.<br><br>Recurrente<br><br>v.<br><br>DEPARTAMENTO DE EDUCACIÓN DE PUERTO RICO<br><br>Recurrida | TA2026RA00118 | *Revisión Administrativa* procedente del Departamento de Educación<br><br>Caso Núm.: 2425-06-04-01724<br><br>Sobre: Educación especial |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Ronda Del Toro y la Juez Lotti Rodríguez.

Lotti Rodríguez, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 28 de mayo de 2026.

Comparece la señora Luz K. Pizarro Correa (en adelante, señora Pizarro Correa o recurrente) en representación de su hijo D.J.P.P, mediante recurso de *revisión judicial* presentado el 18 de marzo de 2026, nos solicita que dejemos sin efecto la *Resolución Final y Orden* emitida y notificada el 16 de febrero de 2026 por el Foro Administrativo de Educación Especial (en adelante, foro administrativo). Mediante el referido dictamen, el foro administrativo ordenó el cierre y archivo de la querella instada por la recurrente.

Por los fundamentos que expondremos a continuación, se confirma la *Resolución* recurrida en todos sus extremos.

## I.

Surge del expediente administrativo que el menor D.J.P.P., de cuatro (4) años, fue determinado elegible para recibir servicios bajo el Programa de Educación Especial del Departamento de Educación, en la categoría de

impedimento de Trastorno del Espectro Autista Nivel 3.[1] El expediente refleja además diagnósticos de Síndrome de Klinefelter, hipotonía generalizada y disfagia, así como rezagos en lenguaje receptivo y expresivo, dificultades sensoriales y de comportamiento.[2]

Según el informe de evaluación en autismo, realizado el 5 de junio del 2023, el menor fue diagnosticado con autismo y presenta necesidad de ayuda especializada.[3] Luego de varias evaluaciones, el menor recibió recomendaciones relacionadas con terapias de habla y lenguaje, terapia ocupacional, terapia física y terapia ABA[4]. En particular, una evaluación ABA realizada en el año 2024 recomendó terapia ABA cinco (5) veces por semana en entorno escolar, junto con intervención colaborativa consultiva con maestros y asistentes.[5] Dichas recomendaciones fueron incorporadas al Programa Educativo Individualizado ("PEI") 2024-2025.[6] No obstante, a pesar de que estas recomendaciones se encuentran vinculadas al PEI desde el 2024 y fueron aceptadas por el Departamento de Educación de Puerto Rico (en adelante, DE o parte recurrida), en la determinación recurrida la juez administrativa consignó que no se ha logrado aun la vinculación efectiva por razones logísticas y de poca disponibilidad de proveedores especialistas en ABA en el DE, por lo que se mantiene a D.J.P.P. en lista de espera.[7]

El 24 de abril de 2025, la recurrente instó la *Querella* de epígrafe.[8] En síntesis, solicitó revisión y enmienda del PEI 2025-2026; terapias ABA, ocupacional, física, habla y disfagia; servicios compensatorios; ubicación educativa bilingüe; reembolso de gastos; y que se le autorizara fungir como

---

[1] Entrada #1 en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC TA), Apéndice #5, *Programa Educativo Individualizado (PEI)*, págs. 1-2.
[2] Entrada #1 del SUMAC TA, Apéndice #3, "*Initial treatment plan Da Pi 9508*", págs. 2-3; Apéndice #2, *Resolución*, Determinaciones de Hechos, pág. 7.
[3] Entrada #1 del SUMAC TA, Apéndice #2, *Resolución*, Determinaciones de Hechos, pág. 7.
[4] Análisis del Comportamiento Aplicado, o *"Applied Behavior Analysis"* por sus siglas en inglés.
[5] Entrada #1 del SUMAC TA, Apéndice #2, *Resolución*, Determinaciones de Hechos, págs. 7-8.
[6] Íd., pág. 5.
[7] Íd.
[8] Entrada #13 del SUMAC TA, Anejo "Expediente Certificado", *Solicitud de Querella*, págs. 76-78; Entrada #15 del SUMAC TA, Anejo I.

asistente de servicios del menor (T1).[9] Al día siguiente, y a petición de la recurrente, se refirió la misma a mediación.

El 29 de abril de 2025, el DE presentó su *Contestación a Querella*, en la cual indicó, entre otras cosas, que el PEI 2025-2026 no había sido firmado.[10] Además, adujo que pactó la ubicación de educación temprana en salón especial en el hogar. En cuanto a los remedios, el DE alegó que el COMPU[11] se coordinaría a través de la mediación, y allí se abordarían los asuntos relacionados a las terapias y al asistente de servicios.[12] En cuanto al reembolso de gastos de transportación, el DE alegó que no procedía en derecho. Sobre el resto de los remedios solicitados, el DE los negó por falta de información o insuficiencia de alegaciones.

Así las cosas, el 1 de mayo de 2025, la recurrente presentó una *Moción en Derecho en favor del estudiante [D.J.P.P].*[13]

El 2 de mayo de 2025, se celebró una reunión de mediación. Surge del expediente que durante dicho proceso se alcanzaron acuerdos relacionados con revisión y enmienda del PEI 2025-2026, evaluación de compensación de servicios terapéuticos, plan de transición escolar y asuntos relacionados con el pago de la beca de transportación.[14] No obstante, permanecieron pendientes controversias relacionadas con la terapia ABA, asistente de servicios (T1), adiestramiento a la familia, servicios educativos bilingües, coordinación de terapias y otros servicios relacionados.

Posteriormente, el foro administrativo emitió varias órdenes relacionadas con el trámite del caso y la celebración de reuniones del COMPU.[15] Así las cosas, el 15 de julio de 2025, el foro administrativo emitió

---

[9] Entrada #15 del SUMAC TA, Anejo I, págs. 4-6.
[10] Entrada #13 del SUMAC TA, Anejo "Expediente Certificado", *Contestación a Querella*, págs. 73-75.
[11] Comité de Programación y Ubicación.
[12] Entrada #13 del SUMAC TA, Anejo "Expediente Certificado", *Contestación a Querella*, págs. 73-75.
[13] Íd., *Moción en Derecho en favor del estudiante [D.J.P.P]*, págs. 69-72.
[14] Íd., *Moción informativa y en cumplimiento de Orden*, págs. 34-36.
[15] Íd., págs. 22-23, 28-29, 32-33.

una *Orden de Conversión de Vista y Extensión de los Términos*, mediante la cual extendió el término para resolver la querella y emitir la Resolución Final.[16]

El 29 de agosto de 2025 se celebró una reunión del COMPU. Luego de celebrado el COMPU, el 4 de septiembre de 2025 el foro administrativo celebró una vista de seguimiento en la que ambas partes comparecieron con nueva representación legal.[17] Durante dicha vista se discutieron asuntos relacionados con ubicación escolar, servicios terapéuticos y la solicitud de la recurrente de fungir como asistente de servicios del menor.[18]

El 21 de octubre de 2025, el DE presentó una *Moción Informativa y en Cumplimiento de Orden* en la que solicitó el cierre y archivo de la querella, toda vez que, a su entender, la agencia ya había realizado todas las gestiones que tenía a su alcance para proveer los servicios al menor.[19] Asimismo, en dicha moción el DE informó, entre otras cosas, que el PEI 2025-2026 y varias minutas de reuniones del COMPU no habían sido firmadas. Además, indicó que continuaban pendientes controversias relacionadas con terapia ABA y la solicitud de la recurrente de fungir como asistente de servicios.[20]

En cuanto a este último asunto, el DE informó que tenía disponible tres (3) asistentes de servicio, una (1) para un estudiante en particular y dos (2) de grupo.[21] Por otro lado, informó que D.J.P.P. no asistía al salón de clases.[22] La recurrente no firmó ninguna de las minutas de los COMPU ni el PEI 2025-2026 completado, razón por la cual el DE expresó que ello impidió la vinculación efectiva de servicios y la contratación de proveedores, ya que el PEI formaliza el contrato necesario para que los proveedores brinden las terapias.

---

[16] Entrada #13 del SUMAC TA, Anejo "Expediente Certificado", *Orden de Conversión de Vista y Extensión de los Términos*, págs. 48-49.
[17] Íd., *Minuta de Señalamiento de Vista en su Fondo y extensión de los términos*), págs. 41-43.
[18] Íd.
[19] Íd., *Moción Informativa y en Cumplimiento de Orden*, págs. 34-36.
[20] Íd., pág. 35.
[21] Íd.
[22] Íd.

Tras varios incidentes y conflictos de calendario, la vista fue reprogramada para el 27 de enero de 2026. Sin embargo, el 21 de enero de 2026, el DE presentó *Moción en Solicitud de Transferencia de Vista* en la que, además de informar conflicto en el calendario, reiteró que ya se habían llegado a acuerdos sobre varios asuntos de la querella, sobre los cuales el foro no tenía jurisdicción. Entre los acuerdos logrados fue la celebración de la reunión del COMPU el 29 de agosto de 2025, pero que la recurrente no había firmado la Minuta de la reunión. Además, señaló que no hubo acuerdo sobre el asunto de la madre como asistente de servicios y terapia no identificada.[23]

Finalmente, la vista se señaló para el 2 de febrero de 2026.[24] Llegado el día de la vista, comparecieron: la recurrente por derecho propio; la representación legal del DE, acompañada de la señora Delbrey Figueroa, facilitadora del Programa de Educación Especial, y de la trabajadora social del Centro de Servicios de Educación Especial. A continuación, se resume lo acontecido en dicha vista:

**A. Vista Administrativa del 2 de febrero de 2026**

Durante la vista administrativa, la recurrente resumió los reclamos planteados en la querella.[25] Como parte de su testimonio, la juez le orientó a la parte recurrente sobre la posibilidad de firmar el PEI en controversia, pero esta sostuvo que no lo firmó debido a que, según indicó, el documento no recogía íntegramente las controversias y planteamientos que había formulado durante el proceso administrativo.[26] Asimismo, declaró que el menor requería apoyo individualizado y reiteró su solicitud de fungir como asistente de servicios transicional, al sostener que D.J.P.P. presenta ansiedad severa por separación y únicamente permite que ella atienda asuntos relacionados con su higiene íntima (cambio de pañales).[27]

---

[23] Entrada #13 del SUMAC TA, Anejo "Expediente Certificado", *Moción en Solicitud de Transferencia de Vista*, págs. 24-27.
[24] Íd., *Minuta de Señalamiento de Vista en su Fondo y extensión de los términos*, págs. 22-23.
[25] Regrabación de la vista administrativa celebrada el 2 de febrero de 2026, 0:08:33-0:11:00.
[26] Regrabación, 0:12:15-0:13:40.
[27] Regrabación, 0:14:52-0:15:09.

La recurrente sostuvo además que el DE tardó en reconocer que el menor se comunica en inglés, su idioma dominante, y manifestó que la ubicación escolar originalmente ofrecida no contaba con personal bilingüe.[28] A preguntas de la representación legal del DE, reconoció que el PEI 2024-2025 no contenía disposiciones relacionadas con la figura de asistente T1 y admitió que no firmó la minuta correspondiente a la reunión del COMPU celebrada el 29 de agosto de 2025.[29] Igualmente, declaró que las terapias ABA no habían sido provistas a pesar de encontrarse recomendadas desde hacía tiempo y expresó que había realizado gestiones para identificar proveedores privados y notificarlo a la agencia. Según indicó, parte de su inconformidad con los documentos preparados durante el proceso administrativo respondía a que, a su juicio, estos no reflejaban adecuadamente sus expresiones y preocupaciones planteadas en las reuniones del COMPU, como las preguntas sobre el pago de deducibles.[30]

Por su parte, la facilitadora docente del Programa de Educación Especial, la señora Delbrey Figueroa, declaró sobre las recomendaciones discutidas durante los procedimientos administrativos relacionadas con el proceso de transición del menor al entorno escolar. En esencia, explicó que las recomendaciones profesionales contemplaban inicialmente la participación de la madre durante determinadas terapias y actividades escolares, con el objetivo de reducir progresivamente dicha intervención para fomentar la adaptación e independencia del estudiante.[31] En cuanto a la solicitud de que la madre fungiera como asistente de servicios, la facilitadora explicó que la agencia no favorecía dicha alternativa debido al nivel de apego emocional existente entre la recurrente y el menor y al interés de promover un proceso de independencia.[32]

---

[28] Regrabación, 0:17:18-0:18:00.
[29] Regrabación, 0:19:49-0:20:02; 0:21:00-0:21:09.
[30] Regrabación, 01:17:15-1:17:30.
[31] Regrabación, 0:26:35-27:50.
[32] Regrabación, 0:28:50-29:05.

Indicó además que el Departamento de Educación no contaba con una figura de asistente transicional o emocional como la solicitada por la recurrente.[33] No obstante, declaró que durante los procedimientos del COMPU se discutió un plan de transición que permitiría la participación inicial de la madre en el proceso de integración escolar del estudiante.

La facilitadora docente también declaró sobre la alternativa de ubicación escolar ofrecida al menor. Según explicó, la ubicación inicialmente identificada contaba con asistentes de servicio disponibles y un salón especializado para estudiantes con autismo. No obstante, indicó que dicha ubicación no llegó a concretarse porque la parte recurrente no visitó la escuela ni se dio la reunión del 5 de junio para establecer el plan de transición.[34] Explicó que ante la inexistencia de un PEI firmado, solo quedan los servicios que están contemplados en el último PEI, el cual no dispuso sobre la necesidad de un asistente.[35]

Más adelante, la juez le preguntó a la parte recurrente si no estaba de acuerdo con buscar una ubicación privada, a lo que esta expresó estar de acuerdo, pero que esa oportunidad había surgido "ahora". La facilitadora nuevamente explicó que desde abril se le brindó a la recurrente la alternativa de ubicación de la escuela Francisco López Cruz en un grupo de autismo, donde su hijo sería el estudiante número ocho, con tres asistentes de servicio, pero la recurrente no se acercó a la escuela y ni tan siquiera la visitó. Ya cuando se auscultó en diciembre, y al ver otras necesidades de otros estudiantes de participar del salón, se le cedió el espacio a otro estudiante.[36] La mamá entonces notó que la escuela no era bilingüe, pero la facilitadora notó que el ofrecimiento tenía una maestra que dominaba el inglés, y D.J.P.P. entendía en español, pero contesta en inglés.[37]

---

[33] Regrabación, 0:29:10-29:20.
[34] Regrabación, 0:29:24-0:30:35.
[35] Regrabación, 0:34:18-0:34:30.
[36] Regrabación, 0:44:25-0:44:59.
[37] Regrabación, 0:45:57-0:46:05.

Al auscultar sobre si ya había conseguido una propuesta privada, la recurrente admitió que aún no la tenía. No obstante, la facilitadora indicó que se le orientó y preparó una lista que le facilitó a mamá para identificar colegios con contrato, pero que la parte recurrente tenía que buscarla.[38] La juez le aclaró a la recurrente que debía saber que la propuesta era por año escolar.[39] La madre indicó que el problema era que se encontraba con falta de cupo, además que le dijeron que las escuelas en Puerto Rico bilingües no son para estudiantes que hablan inglés, sino para estudiantes que necesitan ajustar su inglés.[40] La facilitadora seguidamente aclaró que esas escuelas aceptan estudiantes que hablan inglés o español y allí adquieren las destrezas.

De otra parte, la facilitadora reconoció que el DE tenía la obligación de proveer terapias ABA al menor y explicó las dificultades relacionadas con la disponibilidad de proveedores y la frecuencia recomendada de los servicios. Además, indicó que el estudiante se encontraba en lista de prioridad para vinculación de servicios. Se le ha intentado vincular este, con la corporación *Jellyfish Academy*, pero ésta no cuenta con cinco (5) días conforme recomendado.

En cuanto al asunto del reembolso relacionado con estas terapias, la facilitadora explicó que nunca se han negado a contabilizarlos, pero se le informó a mamá que cuando comenzaran los servicios de terapia, desde ese momento se contabilizarían.[41]

El foro administrativo tomó conocimiento de la dificultad para vincular las terapias, las cuales se estarían dando por el plan médico, mediante reembolso. El foro indicó que procedía determinar la cantidad de reembolso sobre ABA.[42] No obstante, la recurrente expresó que aún la terapia no había empezado, pero que eran doscientos ($200) dólares al mes y se le podía

---

[38] Regrabación, 0:47:08-0:47:33.
[39] Regrabación, 0:47:58-0:48:11.
[40] Regrabación, 0:48:40-0:48:57.
[41] Regrabación, 01:04:52-1:05:57.
[42] Regrabación, 01:06:05-1:08:10.

enviar.[43] Sobre la beca de transportación, la facilitadora volvió a orientar a la recurrente y le informó que no se había pagado por no haber un PEI firmado.[44]

La representación legal del DE indicó que lo apropiado era ordenar la provisión de servicios de terapias ABA, pero el reembolso sería tema de una nueva *Querella.* La juez notó que no había nada que compensar pues no había comenzado, y aun no había pagado nada, por lo que no hay reembolso aún.[45] La recurrente indicó que en agosto había espacios en *Spectrum ABA,* pero nunca le contestaron o ubicaron al niño.[46]

La juez aclaró que solo resolverá en la *Resolución* lo de la terapia ABA y el T1. La recurrente indicó que se mencionó en la *Querella* lo de la necesidad de terapias y ubicación bilingüe.[47] La juez le recordó el ofrecimiento de escuela original; y resaltó que los hechos cambiaron desde que se presentó la *Querella.*

De otra parte, la representación legal del DE insistió en que, sin un PEI firmado (aunque fuera en controversia), el DE carece de un marco legal para obligar a las corporaciones a brindar servicios y vincular efectivamente al estudiante.[48]

Finalmente, al concluir la vista administrativa, el foro indicó que ordenaría la vinculación del estudiante a terapias ABA conforme recomendado. No obstante, expresó que las controversias relacionadas con ubicación escolar debían atenderse prospectivamente mediante una propuesta educativa privada y futuras reuniones del COMPU. Además, señaló que cualquier asunto relacionado con reembolso de gastos resultaba prematuro ante la ausencia de evidencia de pagos efectuados o servicios ya comenzados.[49]

---

[43] Regrabación, 01:10:50-1:11:08.
[44] Regrabación, 01:09:24-1:10:20.
[45] Regrabación, 01:11:15-1:13:20.
[46] Regrabación, 01:17:15-1:17:30.
[47] Regrabación, 01:37:10-1:38:24.
[48] Regrabación, 01:42:34-1:42:50.
[49] Regrabación, 01:41:20-1:41:58.

El 16 de febrero de 2026, el foro administrativo emitió una *Resolución Final* y orden recurrida, en la cual ordenó, entre otras cosas, el cierre y archivo de la *Querella* del epígrafe.[50] En síntesis, ordenó al DE gestionar la vinculación inmediata del menor a terapias ABA conforme a la frecuencia y modalidad recomendada e informar el estatus de dichas gestiones.

En cuanto a la solicitud para que la recurrente fungiera como asistente de servicios del menor, el foro administrativo concluyó que dicho asunto se tornó prematuro y que posteriormente podría evaluarse en el contexto de una propuesta educativa privada, particularmente ante las necesidades relacionadas con ansiedad por separación e higiene del estudiante.

De otra parte, el foro administrativo dispuso la continuidad del pago de beca de transportación y servicios relacionados bajo remedio provisional conforme surgen del PEI 2024-2025.

Finalmente, el foro administrativo denegó el reembolso solicitado por la recurrente al concluir que no se había presentado evidencia de gastos incurridos y que ciertos reclamos relacionados con deducibles y gastos médicos no surgían expresamente de la querella presentada. Ahora bien, aclaró que la madre podrá presentar una nueva solicitud si en el futuro incurre en gastos relacionados a la prestación privada de servicios.

Inconforme con el proceder del foro administrativo, el 18 de marzo de 2026, la recurrente acudió ante este Tribunal mediante recurso de *Revisión Judicial* y señala los siguientes errores:

> Erró el foro al declarar "prematura" la designación de la madre como Asistente T1 en el sistema público, mientras la validaba para el entorno privado. Esta distinción es clínicamente irracional: [D.J.P.P] solo permite que su madre atienda su higiene íntima según el Plan de Tratamiento ABA de ABA Centers of America (02/04/2026) y la carta de la patóloga del habla Wilmar De Jesús Quiñones (24/11/2025), quien certifica que el niño se niega a trabajar si su madre no está presente. La misma necesidad clínica existe independientemente de si el edificio es público o privado.

---

[50] Entrada #1 del SUMAC TA, Apéndice #2, *Resolución.*

Erró el foro al denegar el reembolso por "falta de evidencia de gasto incurrido", cuando el propio récord administrativo contiene la admisión del DEPR de su incapacidad de proveer ABA, y el Plan de Tratamiento de ABA Centers (02/04/2026) acredita que [D.J.P.P] requiere 29 horas semanales de ABA actualmente cubiertas mediante seguro médico privado Triple-S Salud, Inc. (Member ID: ZUA0012348718316). El nexo causal entre el incumplimiento estatal y el gasto privado es patente, conforme a Burlington School Comm. v. Dep't of Educ., 471 U.S. 359 (1985).

Erró el foro al archivar la querella y delegar el cálculo de servicios compensatorios al COMPU —la misma entidad que ha incumplido por más de un año— sin adjudicar remedio inmediato. El PEI 2025-2026 registra un 0% de ejecución en todas las metas. Bajo Reid v. District of Columbia, 401 F.3d 516 (D.C. Cir. 2005), el Tribunal, y no la agencia responsable del daño, debe adjudicar el remedio compensatorio.

Erró el foro al no ordenar la provisión inmediata de las terapias Ocupacional, Física y Acuática, las cuales llevan más de un año vinculadas en el PEI, pero sin ejecutarse. La evaluación de terapia ocupacional/disfagia (10/04/2024) y la evaluación de terapia física (11/06/2024) contenidas en el expediente justifican ambas intervenciones como médicamente necesarias bajo 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

Por su parte, el 6 de mayo de 2026, la parte recurrida presentó su recurso en oposición a la *Revisión Judicial.* Allí, nos solicita que confirmemos en todos sus extremos la *Resolución Final* recurrida.

## II.

### A. Revisión judicial de decisiones administrativas

La Ley Núm. 38 de 30 de junio de 2017, según enmendada, 3 LPRA sec. 9601 *et seq.,* mejor conocida como la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (en adelante, LPAU), establece el marco normativo que rige la revisión judicial de las decisiones emitidas por las agencias administrativas. *Otero Rivera v. USAA Fed. Savs. Bank,* 214 DPR 473, 484 (2024). Al revisar las determinaciones administrativas, este foro apelativo, está obligado a conceder deferencia a las decisiones de las agencias en vista de que estas poseen la experiencia y el conocimiento especializado respecto a los asuntos que les han sido delegados. *Katirias's Café v. Mun. de San Juan,* 2025 TSPR 33, 215 DPR ___ (2025) (citando a *Rolón Martínez*

*v. Supte. Policía*, 201 DPR 26, 35 (2018)); *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016); *Pagán Santiago et al. v. ASR*, 185 DPR 341, 358 (2012).

En virtud de lo anterior, se ha considerado la razonabilidad de la actuación cuestionada como criterio rector al revisar el proceder de la agencia recurrida. *Katirias's Café v. Mun. de San Juan, supra.* Así pues, debemos evaluar que no se haya actuado de manera arbitraria o ilegal, o de forma tan irrazonable que constituya un abuso de discreción. *Torres Rivera v. Policía de PR, supra.* Por consiguiente, no puede otorgárseles un "sello de corrección automático bajo el pretexto de deferencia a aquellas determinaciones o interpretaciones administrativas que son irrazonables, ilegales o contrarias a Derecho". *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 213 DPR 743, 754 (2024). Es decir, si bien debemos concederles una amplia deferencia a las determinaciones de las agencias administrativas, dicha norma no es absoluta. Íd.

A tenor, la deferencia cede cuando: "(1) la decisión no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o los reglamentos; (3) ha mediado una actuación arbitraria, irrazonable o ilegal, o (4) la actuación administrativa lesiona derechos constitucionales fundamentales". Íd., (citando a *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021)).

En este sentido, existen tres (3) aspectos que delimitan el alcance de la revisión judicial de las decisiones administrativas: "(1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si, mediante una revisión completa y absoluta, las conclusiones de derecho del ente administrativo fueron correctas". *Rolón Martínez v. Supte. Policía, supra*, pág. 36 (citando a *Pagán Santiago et al. v. ASR, supra*). Asimismo, nuestro más Alto Foro ha reiterado que "al enfrentarse a un recurso de revisión judicial proveniente de una

agencia administrativa, será el deber de los tribunales revisar las conclusiones de derecho en todos sus aspectos. No guiados por la deferencia automática [...]". *Vázquez et al. v. DACo*, 2025 TSPR 56, 215 DPR __ (2025).

La Sección 3.14 de la LPAU dispone lo siguiente:

> Una orden o resolución final deberá ser emitida por escrito dentro de noventa (90) días después de concluida la vista o después de la presentación de las propuestas determinaciones de hechos y conclusiones de derecho, a menos que este término sea renunciado o ampliado con el consentimiento escrito de todas las partes o por causa justificada.
> La orden o resolución deberá incluir y exponer separadamente determinaciones de hecho si éstas no se han renunciado, conclusiones de derecho, que fundamentan la adjudicación, la disponibilidad del recurso de reconsideración o revisión según sea el caso.
> La orden o resolución deberá ser firmada por el jefe de la agencia o cualquier otro funcionario autorizado por ley.
> La orden o resolución advertirá el derecho de solicitar la reconsideración ante la agencia o de instar el recurso de revisión como cuestión de derecho en el Tribunal de Apelaciones, así como las partes que deberán ser notificadas del recurso de revisión, con expresión de los términos correspondientes. Cumplido este requisito comenzarán a correr dichos términos.
> 3 LPRA § 9654. (Énfasis nuestro).

De conformidad con lo expuesto, se ha interpretado que una orden o resolución final es aquella que "dispone del caso ante la agencia y tiene efectos adjudicativos y dispositivos sobre las partes". *Pérez López v. Depto. Corrección*, 208 DPR 656, 672-673 (2022) (citando a *Depto. Educ. v. Sindicato Puertorriqueño*, 168 DPR 527, 545 (2006)). En particular, la Sección 4.2 de la LPAU establece que:

> Una parte adversamente afectada por una orden o resolución <u>final</u> de una agencia y que haya agotado todos los remedios provistos por la agencia o por el organismo administrativo apelativo correspondiente podrá presentar una solicitud de revisión judicial ante el Tribunal de Apelaciones, dentro de un término de treinta (30) días contados a partir de la fecha del archivo en autos de la copia de la notificación de la orden o resolución final de la agencia o a partir de la fecha aplicable de las dispuestas en la Sección 3.15 de esta Ley cuando el término para solicitar la revisión judicial haya sido interrumpido mediante la presentación oportuna de una moción de reconsideración. 3 LPRA sec. 9672.

**B. Programa de Educación Especial**

Es sabido que, en Puerto Rico, el derecho a la educación es de rango constitucional. *Orraca López v. ELA*, 192 DPR 31, 40 (2014); *AMPR v. Srio. Educación, E.L.A*, 178 DPR 253, 270 (2010); *Declet Ríos v. Dpto. de Educación*, 177 DPR 765, 773 (2009). En específico, la Carta de Derechos de la Constitución de Puerto Rico la cual, expresamente, dispone que "[t]oda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Art. II, Sec. 5, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 297.

La legislación federal ha reconocido la educación individualizada y libre de restricciones, mediante la ley federal conocida como el *Individuals with Disabilities Education Act*, 20 USCA sec. 1400 *et seq.* (en adelante, Ley IDEA). Esta aplica en Puerto Rico, dado a que, se reciben fondos federales para el programa de educación especial, lo cual lo obliga a regirse por el mandato y las regulaciones establecidas al amparo de la Ley IDEA. En particular, este estatuto federal define la educación especial como aquella instrucción especialmente diseñada, sin costo para los padres, enfocada en atender las necesidades únicas de un estudiante con diversidad funcional. 20 USCA sec. 1401(29). Véase, *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988, 994 (2017). Conforme a ello, "la Ley IDEA tiene el propósito de asegurar que todos los menores con necesidades especiales reciban educación pública, apropiada y gratuita en atención a sus necesidades particulares, como también proteger los derechos de estos y de sus respectivos padres o tutores". *Vélez y otros v. DE y otros,* 209 DPR 79, 103 (2022) (Resolución) (opinión disidente del Juez Asociado Estrella Martínez); Véase, *Orraca López v. ELA, supra,* pág. 42.

Conforme con los preceptos contemplados en la Ley IDEA, en Puerto Rico se creó la Ley Núm. 51-1996, según enmendada, 18 LPRA sec. 1351 *et seq.,* mejor conocida como la *Ley de Servicios Educativos Integrales para*

*Personas con Impedimentos.* Esta tiene como fin principal el garantizar una educación pública, gratuita y apropiada a los estudiantes con necesidades especiales que le permita desarrollarse plenamente y convivir con dignidad en la comunidad de la que forman parte. Exposición de Motivos de la Ley Núm. 51-1996. Además, se creó el *Manual de Procedimientos de Educación Especial para el año escolar,* Departamento de Educación, julio de 2020 (en adelante, Manual de Procedimientos) con el fin de dirigir los procesos relacionados con la prestación de servicios del programa de educación especial.[51]

La Ley Núm. 51-1996 establece que el Estado debe garantizar, hasta donde los recursos lo permitan, una educación pública, gratuita y apropiada, en el ambiente menos restrictivo posible. Art. 3(1) de la Ley Núm. 51-1996, 18 LPRA 1352. Esta debe ser diseñada con las necesidades individuales de cada persona con diversidad funcional y con todos los servicios relacionados indispensables para su desarrollo, según se establezca en su plan individualizado de servicios. No obstante, esta deber ser lo más cercana posible a las demás personas de la corriente regular. Íd. Igualmente, el Estado debe garantizar un proceso de identificación, localización, registro y una evaluación por un equipo multidisciplinario debidamente calificado de todas las personas con diversidad funcional, dentro o fuera de la escuela. Art. 3(2) de la Ley Núm. 51-1996, 18 LPRA 1352. Asimismo, se debe diseñar un Programa Educativo Individualizado, mejor conocido por sus siglas como "PEI", que establezca las metas a largo y corto plazo, los servicios educativos y los servicios relacionados indispensables según lo determine el equipo multidisciplinario. Art. 3(3) de la Ley Núm. 51-1996, 18 LPRA 1352. El PEI es ese plan escrito de las necesidades educacionales del menor con diversidad

---

[51] Véase: *https:// de.pr.gov/ wp-content/uploads/2020/ 10/manual-de-educacion-especial-2020–1.pdf.*

funcional y servicios relacionados a proveerse especialmente diseñados para cumplir con esas necesidades.

### i. Firma del PEI

El Manual de Procedimientos, *supra,* pág. 65, explica que el PEI es un documento que recoge los acuerdos de los servicios educativos, relacionados y suplementarios que el DE se compromete a ofrecerle al estudiante con diversidad funcional. Es un documento oficial que se revisa al menos una vez al año y se enmienda todas las veces que sea necesario. Íd. El PEI se trabaja en tres estatus: borrador, completado o firmado. Íd., pág. 68. En el caso del estatus firmado, se contemplan dos (2) instancias adicionales: el PEI firmado en controversia o el PEI firmado en espera de fondos. En el caso de firmado en controversia, se da cuando el PEI fue discutido en reunión con el COMPU, pero en una o más partes existe controversia entre el DE y los padres. Es decir, se firma el PEI pero se está en espera de una vista administrativa o una reunión con el COMPU para solucionar la controversia. Íd.

Ahora bien, el Manual de Procedimientos, *supra,* contempla los casos en que los padres se rehúsen a firmar el PEI redactado. Íd., pág. 72. En primer lugar, los integrantes del DE dialogarán con ellos con el propósito de llegar a acuerdos satisfactorios. Si el diálogo no resultara en la aprobación del PEI, cualquiera de las partes podrá solicitar una mediación o una querella administrativa. El DE no podrá recurrir a estos procedimientos con el fin de obtener una orden dirigida a iniciar los servicios de educación especial en contra de la voluntad de los padres. Íd.

### ii. Alternativas de ubicación

La localización de alternativas de ubicación es el proceso que realiza el funcionario del COMPU que representa al DE y a las Oficinas Regionales Educativas (ORE) para identificar las escuelas donde se tiene disponible la alternativa de ubicación recomendada en el PEI. Íd., pág. 90. La

responsabilidad del DE es garantizar la disponibilidad de la alternativa de ubicación lo más cercano al hogar. Íd.

Cuando el DE no tiene la alternativa de ubicación recomendada en el PEI, este puede determinar identificar una escuela privada para comprar el servicio educativo a costo público. Íd., pág. 91. Asimismo, los padres pueden presentar una propuesta de una escuela privada de su predilección. Íd., pág. 96. La determinación de que la alternativa de ubicación no se tiene disponible en el DE le corresponde a la Secretaría Asociada de Educación Especial (SAEE) una vez funcionarios de la SAEE concluyen el proceso de consulta sobre la localización de alternativas de ubicación en todas las escuelas públicas adscritas al DE. Íd., pág. 91.

### iii. Servicios relacionados

El Artículo 2 de la Ley Núm. 51-1996 define los servicios relacionados como "servicios de salud y de apoyo indispensables, que se requieren para que la persona con [diversidad funcional] se beneficie de la educación especial para desarrollar al máximo sus potencialidades". Estos servicios son clave para apoyar, desarrollar y corregir aquellas habilidades que interfieren en el aspecto educativo del estudiante. Los instrumentos por utilizarse para realizar la evaluación serán determinados por el especialista basado en la razón del referido emitida por el COMPU. Manual de Procedimientos, *supra,* pág. 117.

Las recomendaciones del especialista no constituyen una determinación final. El COMPU tiene la potestad de aceptar o rechazar una recomendación ofrecida por un especialista. Íd., pág. 118. Cuando los padres rechazan de forma parcial una evaluación realizada por el DE, el anotador del COMPU documentará mediante Minuta de reunión las partes que son rechazadas y las razones expresadas por los padres para el rechazo. Además, si existiera alguna controversia sobre las recomendaciones realizadas, los

padres o cualquier funcionario del DE pueden solicitar mediación o radicar una querella administrativa. Íd., pág. 118.

### IV. Servicios compensatorios

El Manual de Procedimientos establece que los servicios compensatorios o reposición de servicios se ofrece cuando un estudiante tiene un PEI vigente durante el año escolar de implementación (en curso), pero no se tiene disponible el servicio educativo o relacionado o se interrumpe el servicio por falta de recursos. Manual de Procedimientos, *supra,* pág. 192. **Por tanto, los padres o funcionarios del DE pueden solicitar la compensación de servicios al COMPU cuando se cumple con cualquiera de los dos criterios**. (Énfasis nuestro). Íd. "La solicitud de servicios compensatorios se realizará durante la revisión del PEI para el próximo año escolar donde se esté implementando". Íd. Allí, los padres o funcionarios del DEPR presentarán al COMPU la evidencia: (1) del PEI o PS donde se establecía el servicio que el estudiante tenía que recibir y su frecuencia; (2) cantidad de días lectivos del año escolar; y (3) cuántos servicios el estudiante recibió durante el año escolar. Íd.

Por tanto, los padres podrán solicitar servicios compensatorios correspondientes al año escolar en curso. Íd., pág. 193. No obstante, los servicios no prestados por ausencia del estudiante no advienen al derecho de ser compensados. **Ahora bien, "[p]ara que los servicios sean provistos, el PEI deberá estar en estatus firmado o firmado en controversia para iniciar con los servicios. En caso de que tenga controversia en esta área, los servicios serán provistos según se resuelva en la controversia"**. (Énfasis nuestro). Íd. A esos efectos, los padres o el DE podrán solicitar una mediación o iniciar el proceso de querella para solucionar la situación en controversia. Íd., pág. 194.

**III.**

En el presente recurso, la recurrente alega como primer error que el foro administrativo incidió al declarar "prematura" la designación de la madre como Asistente T1 en el sistema público, mientras la validaba para el entorno privado. Asimismo, sostiene que dicho foro erró al denegar el reembolso por falta de evidencia de gasto incurrido, cuando el propio récord administrativo contiene la admisión del DE sobre su incapacidad de proveer terapias ABA. Como tercer error, alega que incidió el mismo foro al archivar la querella y delegar el cálculo de servicios compensatorios al COMPU sin adjudicar remedio inmediato. Por último, aduce que el foro administrativo erró al no ordenar la provisión inmediata de las terapias Ocupacional, Física y Acuática, las cuales llevan más de un año vinculadas en el PEI, pero sin ejecutarse.

Conforme adelantamos, tales errores no se cometieron. Veamos.

En cuanto al primer error, somos de la opinión que el foro administrativo no descartó que la madre ejerza como Asistente T1. La regrabación de la vista administrativa celebrada el 2 de febrero de 2026 y la *Resolución* recurrida nos permite profundizar sobre este asunto. Según surge de dicha vista, en un principio el DE no estuvo de acuerdo en cuanto a que la madre fungiera como Asistente T1, dado a que, el estudiante tiene apego emocional y el objetivo es que el estudiante lo supere y logre su independencia. Aun así, en el COMPU se le ofreció un plan de transición del hogar a la escuela para incluir la participación de la madre. La primera ubicación que se le ofreció a la recurrente tenía tres (3) asistentes de servicio en el salón con siete (7) estudiantes (ocho con el menor), pero no se pudo completar porque la parte recurrente no visitó la escuela.

Surge de la vista administrativa y *Resolución* recurrida, que el foro administrativo aceptó el nombramiento de la recurrente como Asistente T1 para el entorno privado que eventualmente proponga para su hijo, pero en cuanto al sistema público lo consideró prematuro. Ahora bien, la

determinación de considerar prematura la asignación de la madre como TI responde a que D.J.P.P. no se encuentra ubicado actualmente en el sistema público. Esto, dado a que, el salón ofrecido al estudiante fue cedido a otro estudiante luego de que la recurrente no visitara el plantel ni confirmara su aceptación. Ante ello, lo consideró prematuro porque el menor no se encontraba matriculado en el entorno público, porque la recurrente rechazó la ubicación ofrecida.

En ese caso, el foro administrativo lo que hizo fue orientar a la recurrente a buscar una propuesta en el entorno privado. Debido a que, el DE al momento no cuenta con una ubicación completamente bilingüe y que considere a esta como Asistente TI, así como las opciones que el DE le ofreció fueron rechazadas por esta. De modo que, no excluyó la posibilidad del entorno público, sino que en el contexto de la ubicación se incentivó a la recurrente a conseguir una propuesta de servicio en la esfera privada que le permita ser Asistente T1 del menor y que cumpla con la ubicación completamente bilingüe. Conviene mencionar, que en la vista administrativa la recurrente estuvo de acuerdo con esa sugerencia.[52] Así pues, el primer error no se cometió.

En cuanto al segundo error, el foro administrativo no incidió al denegar el reembolso por falta de evidencia de gasto incurrido. Ciertamente, no surge del expediente administrativo ni de la vista administrativa del 2 de febrero de 2026, que la recurrente haya presentado evidencia de gasto incurrido, así como tampoco está contemplado expresamente en la *Querella* del epígrafe el reembolso de deducibles de $200.00 mensuales y de plan médico $104.00.[53]

---

[52] Regrabación 0:50:00-0:51:10.

[53] Entrada #15, Anejo I de SUMAC TA **(Resulta pertinente mencionar que, la recurrente presentó documentación sobre unos pagos que no se presentaron en el foro administrativo. Es sabido que, este Tribunal no puede pasar juicio sobre prueba que no haya sido considerada en el foro administrativo).**

Conviene señalar, que la Jueza Administrativa no descartó la posibilidad de atender los reembolsos en la aludida vista administrativa.[54]

No obstante, la recurrente manifestó que las terapias ABA no han comenzado, pero van a tener un costo de $200 al mes.[55] Además, esta explicó que eventualmente le enviará al foro administrativo todos los deducibles que se van a pagar.[56] Por tanto, el foro administrativo no emitió orden de reembolso porque no se han pagado las terapias y tampoco se presentó evidencia. Ahora bien, la recurrente no está desprovista de remedios, el foro administrativo aclaró que esta podrá presentar una nueva solicitud si en el futuro incurre en gastos relacionados a la prestación privada de servicios. Por tanto, el segundo error no se cometió.

Al estar estrechamente relacionados, discutiremos el tercer y cuarto error en conjunto. En esencia, la recurrente alega que incidió el foro administrativo al delegar el cálculo de servicios compensatorios al COMPU sin adjudicar remedio inmediato, así como al no ordenar la provisión inmediata de las terapias Ocupacional, Física y Acuática. Según vimos, el Manual de procedimientos, *supra,* pág. 193, dispone que los padres podrán solicitar servicios compensatorios correspondientes al año escolar en curso. Ahora bien, "[p]ara que los servicios sean provistos, el PEI deberá estar en estatus firmado o firmado en controversia para iniciar con los servicios. En caso de que tenga controversia en esta área, los servicios serán provistos según se resuelva en la controversia". Íd. Además, dispone que los padres o funcionarios del DE pueden solicitar la compensación de servicios al COMPU. Íd., pág. 192. "La solicitud de servicios compensatorios se realizará durante la revisión del PEI para el próximo año escolar donde se esté implementando". Íd. De lo anterior, resolvemos que no incidió el foro administrativo al delegar

---

[54] Regrabación 01:10:30-1:10:40.
[55] Regrabación, 01:10:45-1:11:20.
[56] Íd.

el cálculo de servicios compensatorios al COMPU, ya que es ese el organismo designado para ello.

Además, la ausencia de un PEI firmado para el año 2025-2026, impide al DE a obligar a los proveedores a facturar y brindar servicios bajo un plan que no ha sido validado formalmente por la recurrente. Resulta pertinente mencionar que, el PEI puede ser firmado en controversia, lo cual significa que se está en espera de una vista administrativa o una reunión con el COMPU para solucionar la controversia. Íd., pág. 68. Ciertamente, el DE carece de facultad para obligar a los proveedores a facturar y brindar servicios bajo un plan que no ha sido validado formalmente por la recurrente. Aun así, el DE le ofreció servicios que fueron rechazados por la recurrente, y, por tanto, se le incentivó buscar una propuesta en el sistema privado. Por tanto, no incidió el foro administrativo al no ordenar la provisión inmediata de las terapias Ocupacional, Física y Acuática.

Conviene señalar, que correctamente el foro administrativo ordenó la vinculación inmediata del estudiante a terapias ABA en la frecuencia y modalidad recomendada, así como el pago de la beca de transportación a los servicios relacionados, según estaban establecidos en el PEI 2024-2025. Dado a que, el DE no puede condicionar los servicios de beca de transportación que habían sido ofrecidos al estudiante, por la madre del menor no haber firmado el PEI 2025-2026.

**IV.**

Por los fundamentos anteriormente expuestos, se confirma la *Resolución* recurrida.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones